IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OSCAR MEJIA MELENDEZ, AR-7172,  )
                                )
        Petitioner,             )  No. C 15-0527 CRB (PR)
                                )
  v.                            )  **ORDER DENYING PETITION**
                                )  **FOR A WRIT OF HABEAS**
BRIAN KOEHN, Warden,            )  **CORPUS AND DENYING**
                                )  **CERTIFICATE OF**
        Respondent.             )  **APPEALABILITY**
_____ )

## I.    INTRODUCTION

Petitioner Oscar Mejia Melendez seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging his California state court conviction on 24 counts of lewd and lascivious conduct with a child under 14 years of age. For the reasons discussed below, the petition will be denied and a certificate of appealability will not be issued.

## II.    BACKGROUND

### A.    Procedural History

On August 29, 2013, a jury found Petitioner guilty of 24 counts of lewd and lascivious conduct with a child under 14 years of age. Cal. Pen. Code § 288(a). On October 16, 2013, the trial court sentenced Petitioner to 24 years in state prison. On August 8, 2014, the California Court of Appeal affirmed the judgment of conviction and, on October 15, 2014, the Supreme Court of California denied review.

/

On February 4, 2015, Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in this Court. Per order filed on March 16, 2015, this Court (Vadas, M.J.) found that the petition stated cognizable claims under § 2254, when liberally construed, and ordered Respondent to show cause why a writ of habeas corpus should not be granted. On May 12, 2015, the case was reassigned to the undersigned and, on June 17, 2015, Respondent filed an answer addressing the merits of the petition. Petitioner filed a traverse on August 17, 2015.

**B.   Facts**

The California Court of Appeal summarized the facts of the case as follows:

> During 2009, after coming to the United States from Honduras, [Petitioner] moved into the home of his cousin, U., and his cousin's family in Daly City, California. At the time, U. was married to Mrs. C., and they had two children, C.C. and D.C. The youngest, D.C., was born in April 2001 and she was nine years old when [Petitioner] began to live with the family.
>
> [Petitioner] lived in this home for approximately two years. Mrs. C. worked at her job three days a week and U. worked seven days a week. During this two-year period, [Petitioner] would often watch the two children after school while the parents were at work. At no time did Mrs. C. observe any inappropriate behavior between [Petitioner] and D.C., nor did the mother note her daughter was uncomfortable when [Petitioner] was also present.
>
> A short time after [Petitioner] began living in the home, he showed to D.C. a video on his cell phone in which a naked man and woman have sexual relations. D.C. mentioned this event to her parents. U. confronted [Petitioner] and asked to review the cell phone, but the father saw no such film on the device. Shortly after this incident, [Petitioner] began to fondle and touch D.C. when she came home from school. As D.C. related, he would touch her in any place he wanted, including her breasts and vagina. Sometimes, [Petitioner] would invite both D.C. and C.C. into his bedroom so he could play with the children with the lights turned off. He indicated he had hidden money in the room and they should try finding it in the dark. While the two children searched the darkened room, [Petitioner] would fondle D.C. in her private areas under her clothing. This conduct made D.C. feel very uncomfortable.
>
> In addition, there were times when [Petitioner] would kiss D.C. on the mouth and suck on her breasts when the two were alone in his room. The sucking caused discomfort to the minor. She also disliked kissing [Petitioner].
>
> On at least one occasion, C.C., while playing the "look for money" game in the dark, heard the sound of [Petitioner] kissing D.C. on the mouth. The boy told one of his uncles about this and the uncle asked D.C. what was happening in [Petitioner]'s room. The uncle accused D.C. of allowing [Petitioner] to kiss her.
>
> On the stand, D.C. related a specific incident when [Petitioner] actually touched her vagina in her bedroom. It was during the morning and [Petitioner] stood over

her while she was in bed. He put his finger inside her pajamas and then began to touch her vaginal area. She also related another time [Petitioner] exposed his penis to her as he and the minor were in bed together. She actually touched his penis as she tried to move away.

Over time, [Petitioner] would pull D.C. by the waist towards him and cover her mouth as she tried to move away from him. Altogether, D.C. believed [Petitioner] engaged in inappropriate touching of her private area once or twice a week while she attended the third grade. The parts of her body [Petitioner] touched would be different from time to time. She did ask him to stop.

The minor did not tell her mother about these acts because she "never thought of it." D.C. did tell her close friend Ana. She did this because Ana had told the minor she was also touched by a man. D.C. told Ana about her own experiences because she did not want Ana to think she was the only one being harmed this way. Ana alerted the police about what was happening to D.C. They came to D.C.'s home and spoke with her. The minor also spoke with Detective Ron Harrison at the Keller Center and admitted [Petitioner] touched her vagina two or three times. After telling Harrison about these acts, D.C. felt much better.

Detective Harrison spoke with D.C. at the Keller Center when the girl was 11 years old. She told the detective the events happened very regularly with occasional, but not prolonged, intervals. There were gaps of a few days but not anything longer. These incidents happened any day during the school week. After speaking with D.C. at the Keller Center, he had Mrs. C. make a phone call to [Petitioner] about some of D.C.'s comments. However, [Petitioner] made no admissions.

The prosecution also presented the detailed testimony of expert witness Miriam Wolf. She is employed as a licensed clinical social worker and forensic interview specialist at the Keller Center in the San Mateo Medical Center. She handles the victims of child sexual abuse. She was presented as an expert on child sexual abuse accommodation syndrome as it is developed in scientific literature. She testified regarding the syndrome as it was manifested in the behavior of D.C. during the time of the alleged molestation attributed to [Petitioner].

Detective Harrison met with [Petitioner] at his workplace and brought him to the Daly City police station on June 1, 2012. Also present was Detective Cecilia Garay, a certified Spanish interpreter. The officers videotaped this meeting with [Petitioner] and it was played to the jury at trial. A transcript of the interview was also provided to the jury. In the interview, [Petitioner] indicated he was 44 years old and worked as a dish washer in San Francisco. He stated he had no reason to believe he had done anything wrong.

[Petitioner] admitted he had been living for a period with his cousins and their daughter, D.C. [Petitioner] stated initially he had never touched the girl. The officers indicated they believed [Petitioner] was not interested in hurting D.C., only to be nurturing and loving. He responded that he was not familiar with "that case." He maintained he did not play games in the dark with D.C. or her brother, and that he did not even touch her by mistake.

As the interview continued and [Petitioner] continued to deny any improper conduct, Harrison then indicated he had obtained the DNA of a male from the person of D.C. and he was going to match the evidence with a sample from [Petitioner]. They told him that DNA told the truth.

3

At this juncture, [Petitioner] stated that when he moved into the home in Daly City, D.C. would jump on him and play with him while he visited with his cousins. He believed this was a normal thing for a child. Later, D.C. would try to sleep on top of [Petitioner]. He was taking care of her, usually after he had worked his shift and her parents were at their jobs. He was tired at the time and the girl would just get on top of him. "That was it." D.C. just would be "clinging to people." Again, [Petitioner] stated he always respected the girl.

Detective Harrison then discussed the phone call from Mrs. C. where she indicated D.C. accused [Petitioner] of touching her. [Petitioner] stated that Mrs. C. was confused. He told the mother he had no relations with D.C.

The officer told [Petitioner] that since he was not telling him the truth, he was going to take a swab of saliva to compare it with evidence the police had. [Petitioner] stated any testing would not indicate he had relations with the girl. Harrison then said he would take the saliva and compare it with what was found on the body of D.C.; the police wanted him to tell the truth.

With this comment, [Petitioner] told the police he had no bad intentions towards the girl. She would jump on him and "throw herself on me." He affirmed she would kiss him on the mouth, but [Petitioner] would tell her not to do this because they were family. [Petitioner] told D.C. that his cousins would find out about this conduct and he would be in trouble. [Petitioner] acknowledged that D.C. was nine years old during this period.

[Petitioner] admitted that while he was in bed, the minor would come into his room and jump on top of him. She would kiss him and he felt she was "promiscuous." She would become angry when he refused to massage her breasts, but he did put his mouth on D.C.'s breasts at times.

The game that [Petitioner] played in the dark with D.C. and C.C. was devised by the minor girl. It enabled her to have him touch her private area without C.C. knowing because he was busy trying to find the hidden money. The interview with the police continued with [Petitioner] indicating the minor was the provocative one who would demand he embrace or touch her on a regular basis. Even when he was tired from work, she would persist in demanding his physical attention to her. In the end, [Petitioner] did only what he was asked to do by the girl; since he was compliant, there was nothing he did wrong.

In his trial, [Petitioner] testified in his defense. He indicated he was born in Honduras and had only a sixth-grade education. He came to the United States at the age of 38, leaving behind his wife and five children. He testified he never played any games with D.C. and did not have physical contact with her. He never showed her a video with a couple engaging in sexual intercourse. He did not touch her in any way.

Regarding his statements to the police presented in the video exhibit, [Petitioner] testified he did not comprehend what they were discussing with him. Being asked questions by police made him nervous. When he was nervous, he tended to make false statements. He acknowledged he made these false comments because he was nervous during the interview. He did not do anything wrong to the child.

People v. Melendez, No. A140048, 2014 WL 3889107, at **1–3 (Cal. Ct. App. Aug. 8, 2014), review denied (Cal. Oct. 15, 2014).

## III. LEGAL STANDARD

This Court may entertain a petition for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's

5

holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

## IV. DISCUSSION

Petitioner seeks federal habeas relief under § 2254 on two grounds – his confession was obtained without the procedural safeguards guaranteed to him under Miranda v. Arizona, 384 U.S. 436 (1966), and his confession was involuntary due to police coercion.

### A. Petitioner's First Claim: Miranda Violation

Petitioner claims that the trial court erred when it permitted the prosecution to introduce into evidence inculpatory statements he made to the police because the statements were obtained without a valid waiver of his right to counsel and other Miranda safeguards. The claim is without merit.

#### 1. Background

On June 1, 2012, Detective Harrison met with Petitioner at his workplace and brought him to the Daly City police station. Melendez, 2014 WL 3889107, at *2. Detectives Harrison and Garay interviewed Petitioner, and the interview was recorded on videotape and later transcribed. Id. Both the videotape and transcript were presented during trial. Id. During the interview, Harrison and Garay say to Petitioner, "[Y]ou're not under arrest." Response to Order to Show Cause (Response) (dkts. #13–20) Ex. D at 2. Harrison adds, "[Y]ou don't have to talk to me if you don't want to . . . . In fact, if during the interview you want to stop, we'll just stop and I'll take you back to work." Id.

At trial, Petitioner made a motion to suppress statements made to law enforcement during the June 1, 2012 interview, arguing that they were obtained in violation of Miranda. The trial court reviewed the taped interview and arguments of counsel, concluding:

> The issue with regard to Miranda is whether there was interrogation and whether the person was in custody. There clearly was interrogation. [¶] Whether or not the person was in custody. And the test is a preponderance one under the federal standard. And the issue is what would a reasonable person have taken from the circumstances . . . . [¶] . . . He was told he was free to go. He was never disabused of that idea that he was free to go. Under those circumstances, and based on the reasonable circumstances, and not based on [Petitioner]'s upbringing and not based on how he unequally interpreted words or activity but rather what a reasonable person would do under those circumstances. And under that standard,

6

> it is clear to me that [Petitioner] was not under arrest and was not under the functional equivalent of arrest and thus . . . the statement of [Petitioner] is admissible.

Response Ex. C at 77–78.

The California Court of Appeal concluded that "ample evidence supports the determination" that Petitioner was not in custody. Melendez, 2014 WL 3889107, at *4. Citing Miranda, the court reiterated that "Miranda warnings are required if the individual is undergoing 'custodial interrogation.'" Id. "[T]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id. (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). The court found that "the fact [that Petitioner] was taken from work to a police station does not amount to evidence of custody." Id.

The court noted that the test for custody "is based on objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Id. (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). The court "examine[d] how a reasonable person in the suspect's position would have understood his situation to be" and determined that evidence supported the trial court's finding that Petitioner was not in custody: "[T]he officers advised him he was not under arrest; he could stop talking at any time and they would take him back to work. There were no restraints or cuffs used here. Detective Garay was assisting in Spanish during the meeting." Id. Additionally, the court found it "obvious [that Petitioner] felt comfortable stating and restating his version that D.C. was a promiscuous young girl who planned enticing him. While the officers kept bringing [Petitioner] back to the alleged improper touching of the victim, [Petitioner] presented his claim the girl was a young handful who sought his attention regularly." Id.

### 2.   **Clearly Established Federal Law**

A suspect subject to custodial interrogation has a Fifth and Fourteenth Amendment right to consult with an attorney and to have an attorney present during questioning, and the police must explain this right to the suspect before questioning.

7

Miranda, 384 U.S. at 469–73.  But Miranda protections are triggered "'only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  Stansbury, 511 U.S. at 322 (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).  "[I]n custody" means "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  Beheler, 463 U.S. at 1125.  It requires that "a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave," as judged by the totality of the circumstances.  Thompson v. Keohane, 516 U.S. 99, 112 (1995).  This determination is based on an objective inquiry of (1) the circumstances surrounding the interrogation and (2) whether a reasonable person, given those circumstances, would have felt at liberty to end the interrogation and leave.  Id.

The "totality of the circumstances" determines whether a person was "in custody."  United States v. Redlightning, 624 F.3d 1090, 1103 (9th Cir. 2010).  Relevant factors include:

> (1) the language used by the officer to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the detention and (5) the degree of pressure applied to detain the individual.

Id.  The subjective views held by the interrogating officers or the suspect being questioned are irrelevant to the "totality of the circumstances" examination.  J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011).  Based upon a review of all the pertinent facts, the court must determine whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.  United States v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981).

Not all factors need be present to find custody.  See United States v. Brobst, 558 F.3d 982, 996 (9th Cir. 2009).  Nor are these factors exhaustive, as other factors may be pertinent to, or even dispositive of, the custody question.  United States v. Bassignani, 560 F.3d 989, 996 (9th Cir. 2009).  And, even if the initial encounter with police and the defendant was "consensual," i.e., non-custodial, circumstances may "gradually escalate[] into a setting where a reasonable person standing in [the defendant's] shoes would not have felt free to

8

leave" such that the defendant "was effectively in custody." Redlightning, 624 F.3d at 1103 (upholding district court's finding that, under the totality of the circumstances, the initial consensual encounter between police and defendant did not become custodial when police asked defendant if he would submit to polygraph and defendant voluntarily chose to do so).

The defendant bears the burden of proving that he was in custody or under arrest at the time of the interrogation. Bassignani, 560 F.3d at 993.

### 3. Analysis

Here, the California Court of Appeal reasonably determined that, in the context of the entire interview, Petitioner was not in custody. The court referenced the videotape in reasonably concluding that Petitioner "felt comfortable stating and restating his version that D.C. was a promiscuous young girl who planned enticing him." Melendez, 2014 WL 3889107, at *4. This, along with "the officers advis[ing] him he was not under arrest; he could stop talking at any time and they would take him back to work," sufficiently supports the court of appeal's determination that Petitioner was not in custody. Accord Dyer v. Hornbeck, 706 F.3d 1134, 1138–41 (9th Cir. 2013) (upholding finding of no custody where defendant had been locked in a police car while officers searched her house, agreed to be driven to the police station, told she was not under arrest and free to go, and was permitted two unaccompanied breaks). And although Petitioner was questioned at length at the police station, he was not physically restrained or cuffed, and Detective Garay was assisting in Spanish during the meeting. Under the circumstances, the California Court of Appeal's determination that Petitioner was not in custody was not contrary to, or an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1). Nor was the court's determination of the facts unreasonable in light of the entire record. See id. § 2254(d)(2). Petitioner is not entitled to federal habeas relief on his Miranda claim.

### B. Petitioner's Second Claim: Coerced Confession

Petitioner claims that the trial court erred when it permitted the prosecution to admit into evidence inculpatory statements he made to the police because the statements were involuntary due to police coercion. The claim is without merit.

### 1. Background

The California Court of Appeal rejected Petitioner's coerced confession claim on the ground that, based in the totality of the circumstances, Petitioner's statements "were not involuntary." Melendez, 2014 WL 3889107, at *5. The court explained:

> Here, the trial court implicitly concluded the statements of [Petitioner] to Detective Harrison were voluntary. It made the conclusion after reviewing the video and listening to counsel's arguments. We reviewed the same exhibit. At two instances, [Petitioner] laughed with the officers. [Petitioner] seemed calm and alert during the questioning. He felt comfortable enough to argue the alleged victim's sexual instincts were the cause of his predicament. Additionally, at no time did the police indicate to [Petitioner] the matter would go away if he gave them what they wanted. Also, the authorities hold that police misstatements on the strength of their case does not provide a necessary finding of involuntariness.

Id. (citation omitted). Under the totality of the circumstances, the court concluded that the trial court did not err on admitting Petitioner's statements. Id.

### 2. Clearly Established Federal Law

Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment. Blackburn v. Alabama, 361 U.S. 199, 207 (1960). The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting the statements and the effect of that conduct on the suspect. Miller v. Fenton, 474 U.S. 104, 116 (1985); Henry v. Kernan, 197 F.3d 1021, 1026 (9th Cir. 1999). But absent police misconduct causally related to the confession, there is no basis for concluding that a confession was involuntary in violation of the Fourteenth Amendment. Colorado v. Connelly, 479 U.S. 157, 167 (1986).

To determine the voluntariness of a confession, the court must consider the effect that the totality of the circumstances had upon the will of the defendant. Schneckloth v. Bustamonte, 412 U.S. 218, 226–27 (1973). The court then asks whether the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988). In determining whether the defendant's will was overborne by the

circumstances surrounding the giving of the confession, the inquiry "takes into consideration . . . both the characteristics of the accused and the details of the interrogation." United States v. Preston, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc) (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)).  More specifically, courts consider the following factors: the age of the accused, his intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003).

      The Supreme Court has made clear that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Connelly, 479 U.S. at 167.  But police deception alone does not render a confession involuntary. See Ortiz v. Uribe, 671 F.3d 863, 868 (9th Cir. 2011).  Nor does encouraging a suspect to tell the truth amount to coercion. See Amaya-Ruiz v. Stewart, 121 F.3d 486, 494 (9th Cir. 1997), overruled on other grounds by Preston, 751 F.3d at 1019–20.

### 3. Analysis

      The California Court of Appeal's rejection of Petitioner's coerced confession claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). The state court of appeal reasonably determined that Petitioner's statements were not involuntary because they were not extracted by threats or violence, obtained by direct or indirect promises, or secured by improper influence.  Nor were they coerced by physical intimidation or psychological pressure.  The record instead showed that Petitioner laughed with the officers, seemed calm and alert during the questioning, and felt comfortable enough to argue that the alleged victim's sexual instincts were the cause of his predicament.  Under these circumstances, it simply cannot be said that the state court's determination that

11

Petitioner's statements were not coerced was objectively unreasonable. See Williams, 529 U.S. at 409.

To be sure, it is undisputed that Detective Harrison misled Petitioner on the existence of DNA evidence from the victim before Petitioner advanced his claim that D.C. was the aggressor in the relationship. But this sort of deception by itself is compatible with lawful police behavior because it is not likely to result in an involuntary confession. See Ortiz, 671 F.3d at 868 (finding that a detective's statements during polygraph preparation that indicated she was not a law enforcement officer, where surrounding circumstances suggested she was acting at the request of detectives, were not coercive). Nor does Petitioner's contention that he was promised leniency compel a different conclusion. The record shows that during the interview, Detective Harrison said, "Please do not have me show that you are lying, please help me out . . . we will forget everything, let's just do the truth." Response Ex. D. at 39. Harrison's statement may have motivated Petitioner to tell the truth, but is not enough to compel a judicial determination that Petitioner's statements were coerced. See Amaya-Ruiz, 121 F.3d at 494 (noting that encouraging a suspect to tell the truth is not coercion).

Finally, the Court is mindful that a suspect's intellectual disabilities may be taken into account along with other factors in determining whether a confession was voluntary. See Preston, 751 F.3d at 1016 ("[A]lthough low intelligence does not categorically make a confession involuntary, it is 'relevant . . . in establishing a setting' in which police coercion may overcome the will of a suspect."). But although Petitioner had no more than a sixth grade education at the time of the interview, and was in a foreign country, there is no indication that he did not understand the detectives.

Petitioner is not entitled to federal habeas relief on his coerced confession claim because it simply cannot be said that the California Court of Appeal's rejection of Petitioner's claim was objectively unreasonable. See Williams, 529 U.S. at 409.

/

## V. CONCLUSION

After a careful review of the record and relevant law, the Court is satisfied that the petition for a writ of habeas corpus under 28 U.S.C. § 2254 must be DENIED.

And Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability under 28 U.S.C. § 2253(c) also is DENIED because Petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED:  Nov. 12, 2015     _____
                         CHARLES R. BREYER
                         United States District Judge

G:\PRO-SE\CRB\HC.15\Melendez, O.15-0527.denial.final.wpd

13